# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Taylor Corporation,                          Civil No. 19-1918 (DWF/TNL)

              Plaintiff and
              Counterclaim Defendant,

v.                                           **MEMORANDUM**
                                             **OPINION AND ORDER**
Georgia-Pacific Consumer Products, LP,

              Defendant and
              Counterclaim Plaintiff.

---

Alain M. Baudry, Esq., Matthew R. Veenstra, Esq., John A. Marty, Esq., and Lauren Shoeberl, Esq., Saul Ewing Arnstein & Lehr LLP, counsel for Plaintiff.

Barry M. Landy, Esq., Heather M. McElroy, Esq., Jan M. Conlin, Esq., and Kyle W. Wislocky, Esq., Ciresi Conlin LLP, counsel for Defendant.

---

# INTRODUCTION

This matter is before the Court on a Plaintiff Taylor Corporation's ("Taylor")

Motion for Partial Summary Judgment (Doc. No. 54 ("Taylor Motion")) and Defendant

Georgia-Pacific Consumer Products, LP ("Georgia-Pacific") Motion for Summary

Judgment (Doc. No. 79) ("Georgia Pacific Motion")).  For the reasons set forth below,

the Court grants in part and denies in part both motions.[1]

---

[1]     With the exception of the parties' briefs, the Court's citation to the record references ECF page numbers.

# BACKGROUND

In April 2013, Georgia-Pacific and WorkflowOne LLC ("WorkflowOne"),

Plaintiff Taylor Corporation's ("Taylor") predecessor in interest, entered into a one-year

agreement ("Agreement") for the purchase and sale of certain roll and cut sheet paper

products.[2]  (Doc. No. 74, Ex. 1 (the "Agreement").)  Under the Agreement, Georgia-

Pacific agreed to supply specified paper products to Taylor[3] and Taylor agreed to

purchase no less than 2,000 tons of paper per month from Georgia-Pacific during the

term of the Agreement, which was set to expire on March 31, 2014 (Agreement §§ 1, 2).[4]

The parties also agreed on set prices and rebate amounts.  (*Id.*, § 3).

---

[2]     In 2003, prior to its relationship with WorkflowOne, Georgia-Pacific executed an agreement with the Relizon Company ("Relizon"), a supplier of business forms and business process outsourcing services, that was similar to the Agreement.  (Doc. No. 70, Ex. A. (the "2003 Agreement").)  On or about 2006, Relizon was acquired by the parent company of WorkflowOne and executed a modified version of the 2003 Agreement with Georgia-Pacific.  (*Id.* at Ex. B (the "2006 Agreement").)  The operative Agreement at issue in this litigation is an amended version of the 2006 Agreement.  (*See* Agreement.)

[3]     Because Standard Register Company was a successor in interest to WorkflowOne and Taylor is the successor in interest to Standard Register, the Court refers to Taylor interchangeably with those entities as a contracting party.

[4]     In full, Section 2 of the Agreement provides:

Products and Volume

a.     Supplier will supply WorkflowOne with the roll paper products and cut sheet products identified on Exhibit A (collectively, the "Products") to the WorkflowOne facilities identified on Exhibit B (the "Facility" or "Facilities"), provided that Supplier continues to manufacture the primary basis weights of the core grades.  If Supplier discontinues a primary basis weight of a core grade, it shall provide WorkflowOne at least six (6) months prior written notice, Supplier agrees to exercise commercially reasonable efforts to add additional Products as reasonably requested by WorkflowOne.  While WorkflowOne will exercise

The Agreement further provides that "[i]f [Georgia-Pacific] discontinues a primary basis weights of a core grade, it shall provide [Taylor] at least six (6) months prior written notice."  (*Id*. § 2.a. (the "Notice Provision").)  The Agreement also states:

---

commercially reasonable efforts to purchase the Products from Supplier (subject to limitations imposed by WorkflowOne's customers and the meeting of WorkflowOne's quality and delivery requirements), WorkflowOne makes no commitment that the entire range of Products will be purchased from Supplier. The purchase obligations of WorkflowOne under this Agreement are nonexclusive.

b.      Volume supplied and purchased will, unless agreed to by both parties, be no less than 2,000 tons minimum per month; provided that Supplier shall not be obligated to supply such quantities if Supplier determines that WorkflowOne does not meet Supplier's credit standards as determined by Supplier in Supplier's sole discretion.

c.      In addition to Section 2(b) above, tonnage subject to this Agreement may fall below the minimum 2,000 tons per month (based on the average of the previous three (3) months) without violation of the Agreement tonnage terms if any of the following conditions occur:

(1)      Supplier's failure to deliver Products.

(2)      Either party's divestiture or retirement of one or more of its divisions, affiliates or operations, with the minimum volume requirements of Section 2(b) adjusted proportionately based upon the purchase of Products by the divested or retired operations in the year prior to divestiture.

(3)      Technological changes in the products/marketplace, including, but not limited to LaserMOCR and related imaging grades; provided that Supplier does not manufacture products of comparable performance and grade.

(4)      Supplier discontinues a basis weight or cut sheet size as a standard grade.

(Agreement § 2.)

"[Taylor] makes no commitment that the entire range of Products will be purchased from [Georgia-Pacific]" and "[t]he purchase obligations of [Taylor] under this Agreement are nonexclusive." (*Id.* § 2.a.) However, Taylor was obligated to use commercially reasonable efforts to buy from Georgia-Pacific unless Georgia-Pacific could not fulfill its requirements:

> [Taylor] will exercise commercially reasonable efforts to purchase the Products from [Georgia-Pacific] (subject to limitations imposed by [Taylor's] customers and the meeting of [Taylor's] quality and delivery requirements).

(*Id.* (the "Preferred Supplier Provision").) The Agreement also contained a provision requiring Taylor to keep Georgia-Pacific consignment stock on hand (the "Consignment Provision"):

> [Taylor] agrees to purchase from [Georgia-Pacific] the Products and shall maintain the Products at the facilities set forth on Exhibit C. . . Both parties will set a target for the volume of Consignment Stock of approximately eight hundred (800) tons of Product at the Consignment Facilities. . .

(*Id.* § 5.)

In October 2014, Georgia-Pacific and The Standard Register Company (WorkflowOne's successor in interest) entered into a reinstatement and ratification of the Agreement, extending the Agreement's term to March 31, 2015. (Doc. No. 74, Ex. 2 (the "First Amendment").) In February 2015, Georgia-Pacific and Standard Register amended the Agreement again, extending the term to March 31, 2016. (*Id.*, Ex. 3 (the "Second Amendment").)

Later in 2015, Standard Register filed for bankruptcy. At that time, Standard Register's pre-petition debts owed to Georgia Pacific totaled over $3.7 million. (Doc.

No. 75 ("Settlement Agreement").)  Georgia-Pacific and Standard Register negotiated a Settlement Agreement whereby Georgia-Pacific used pre-petition and post-petition rebates owed to Standard Register to satisfy a portion of the pre-petition debt that Standard Register owed to Georgia-Pacific.  (*Id.* ¶ 4.)  The Settlement Agreement settled all "Amounts Due Under the Existing Agreement."  (*Id.*)

The Settlement Agreement also provided that Standard Register and Georgia-Pacific would enter into a "Replacement Agreement" that would "govern their relationship after the date of this Settlement Agreement," and supersede the parties' then current sales and purchase agreement known as the "Existing Agreement."  (*Id.*, ¶ G.) That "Replacement Agreement" was the Third Amended Sales and Purchase Agreement (Doc. No. 74, Ex. 5 (the "Third Amendment")).  The Third Amendment assigned the Agreement to Taylor and removed sections 2(b) and 2(c), including the 2,000-ton minimum.  (*Id.* at II.1c ("Sections 2(b) and 2(c) are deleted in their entirety.")).  The Third Amendment extended the term of the Agreement until October 31, 2018.[5]  (*Id.*) The parties continued to perform under the Agreement until the alleged breach precipitating this lawsuit.

In 2018, Georgia-Pacific and Taylor entered into a final amendment, extending the term of the Agreement to October 31, 2021.  (Doc. No. 74, Ex. 6 ("Final Amendment").

---

[5]     The Third Amendment was not submitted or ruled upon by the bankruptcy court.

The Notice Provision, along with the Preferred Supplier Provision and the Consignment

Provision, remained in all amended versions of the Agreement.[6]

Throughout the Agreement, Taylor purchased significant quantities of roll

products from suppliers other than Georgia-Pacific.  (Doc. Nos. 84-1 at 12-14; 66-2 at 7.)

Taylor memorialized its "Strategy" to "[i]dentify multiple Preferred Suppliers to promote

a competitive situation that reduces total cost" in a PowerPoint it used in sourcing

meetings.  (Doc. No. 84-22 at 2, 6.)  Georgia-Pacific supplied Taylor with "roll supply

forecasts" for planning purposes.  (Doc. No. 66-1 at 2-3.)  Taylor claims that it bought as

much volume of the Products as it could from Georgia-Pacific, but that Georgia-Pacific

could not fulfill all of its needs.  (Doc. No. 70-4, Ex. E at 6; *see also* Doc. No. 96 ¶ 8.)

Taylor therefore asserts that it created its paper supply plan based on Georgia-Pacific's

forecasts by planning to buy the balance of its requirements that Georgia-Pacific was

unable to provide from other suppliers.  (Doc. No. 66, Ex. L at 3-4.)  Georgia-Pacific

claims that the forecasts were estimates between the parties and would frequently be

missed due to various challenges including equipment failure.  (Doc. Nos. 84 at 39; 84-3

at 20.)

---

[6]     The 2003 and 2006 Agreements included similar Notice and Preferred Supplier
provisions, however the notice requirement was 30 days rather than six months, and the
Preferred Provider provision stated, "[w]hile Relizon will exercise commercially
reasonable efforts to purchase the products from Supplier (subject to limitations imposed
by Relizon' customers and the meeting of Relizon' quality and delivery requirements),
Relizon can make no commitment that the entire range of Products will be purchased
from Supplier."  (2003 Agreement; 2006 Agreement.)

In 2017, Taylor increased its volume of paper purchased from Georgia-Pacific from 41,253 to 51,096 tons. (Doc. No. 96 ("Sec. Parker Decl.") ¶ 7.) Taylor sought to increase purchases from Georgia-Pacific even more but asserts that Georgia-Pacific could not fulfill all of Taylor's requirements. (*Id.* ¶ 8.) Georgia-Pacific acknowledged that Taylor could have purchased at least 60,000 tons annually, which would have entitled Taylor to the maximum "Tier 6" volume rebate under the parties' negotiated price schedule had Georgia-Pacific been able to supply that amount of volume. In recognition of the fact that Georgia-Pacific was unable to supply all of Taylor's volume requirements, Georgia-Pacific agreed to price Taylor's purchases based on the Tier 6 rebate level even though Taylor's actual purchase volume was thousands of tons short of the 60,000 ton mark. (*Id.*; *see also* Doc. No. 84-6 at 35.) In November 2018, Georgia-Pacific provided 70% of Taylor's paper needs, and was still the primary or sole provider for certain plants and grades. (Doc. No. 66-3, Ex. O.)

Taylor resold to Citibank roll paper it purchased from Georgia-Pacific. (Doc. No. 84-4 at 16.) Georgia-Pacific was aware of the arrangement and agreed to ship paper purchased by Taylor directly to Citibank. (Doc. No. 93 ("Burnett Decl.") ¶ 4.) Georgia-Pacific claims that it did not know the price at which Taylor resold its paper to Citibank or the margin that Taylor made on those sales. (Doc. No. 84-6 at 12.) Similarly, Georgia-Pacific claims that Citigroup never knew the price that Taylor paid Georgia-Pacific for the paper. (Doc. No. 84-5 at 33.) Taylor contends, though, that Georgia-Pacific knew the details of its pricing mechanism with Citibank and agreed to coordinate price changes to maintain a level of profit for Taylor. (Doc. No. 96 ¶¶ 15-20; 97-1, 97-2,

97-3, 97-4, 97-5, 97-6, 97-7.)  Notwithstanding, Taylor admits that the Agreement did not

obligate Taylor to resell paper to Citibank, nor did it dictate the quantity or price of any

such sale.  (Doc. No. 83, Ex. 11 at Requests for Admission Nos. 34, 36-38.)

Rather, Taylor had a separate contract with Citibank to which Georgia-Pacific was

not a party, that governed the sales (the "Citibank Agreement").  (*Id.* at Requests for

Admission No. 26; Doc. Nos. 84-10, 84-11, 84-12, 84-13, Exs. 12-15 (the "Citibank

Agreement").)  The Citibank Agreement consisted of a master services agreement

("MSA") that served as a framework for potential future sales between Citibank and

Taylor, as well as individual Statements of Work ("SOW") for distinct products, one of

which was for roll paper.  (Doc. No. 84-5 at 6; *see also* Citibank Agreement.)  Under the

Citibank Agreement, Citibank was not obligated to purchase any roll paper from Taylor,

(Doc. Nos. 84-10 at 6, 84-11 at 3, 84-13 at 6), nor to spend any minimum amount (Doc.

No. 84-13 at 6.)  The Citibank Agreement did not require Taylor to sell Georgia-Pacific

roll paper, nor was Taylor the exclusive supplier to Citibank.  (Doc. Nos. 84-4 at 16-17;

84-5 at 9, 34.)  The operative SOW between Citibank and Taylor expired on its

"Completion Date" of June 30, 2019.  (Doc. No. 84-13 at 4.)  Instead of renewing the

Citibank Agreement, Taylor decided to terminate it and cancel all contracts with

Citibank.  (Doc. No. 84-16 at 4-5.)  Taylor asserts that it was forced to cancel the

contracts because of Georgia-Pacific's abrupt cessation of supplying paper.  (*See, e.g.*

Burner Decl. ¶ 13.)  Citibank expressed concern, but Taylor did not change its decision to

terminate the current MSA and SOWs.  (Doc. No. 84-16 at 2-3.)  Instead, Taylor

proposed a new MSA with terms that Citibank found unfavorable and did not accept. (Doc. Nos. 84-17 at 2-3, 84-39 at 3.)

In late December 2018, Georgia-Pacific notified Taylor that it would no longer manufacture the roll paper products that Taylor had been purchasing. (Doc. No. 84-2 at 69.) Soon after, Georgia-Pacific decided to exit the communication papers business entirely. (Doc. No. 84-1 at 11-12.) Georgia-Pacific notified all of its customers about its decision on January 10, 2019. (*Id.* at 62.) Georgia-Pacific manufactured its last shipping roll of the roll products that Taylor used in late January 2019, and Georgia Pacific's last direct shipment of products to Taylor was in February 2019 but Taylor continued to withdraw Georgia-Pacific paper products from inventory until April 2019. (Doc. No. 66-6, Ex. V.)

Taylor alleges that Georgia-Pacific breached the Agreement by failing to give six-months' notice of the discontinuance of the supply of paper products and, therefore, that they are entitled to damages for having to purchase their paper supply from other suppliers during that six-month period. (Doc. No. 31 ("Am. Compl.") ¶¶ 14-18 ("Count One").) In Count Two, Taylor alleges promissory estoppel. (*Id.* ¶¶ 19-25 ("Count Two").)

Taylor seeks the following damages: (1) up to $3,520,000 in cover damages, representing the increased price of paper it allegedly purchased from others and (2) $2,530,000 in lost profits damages, representing five years of profits allegedly lost following the loss of its resale contract with Citibank. (Doc. No. 66-2, Ex. N at 3.)

Taylor moves for summary judgment on just Count One.[7]  (Taylor Motion).

Georgia-Pacific moves the Court for an order dismissing both claims, granting summary

judgment in favor of Georgia-Pacific on its Counterclaim for breach of contract (Doc.

No. 35 at 7-12("Counterclaim")), and awarding Georgia-Pacific damages on its

Counterclaim of $362,295.89 before any award of prejudgment interest, costs, and

attorney fees.[8]  (Georgia-Pacific Motion.)

## DISCUSSION

### I.   Legal Standard

Summary judgment is proper if there are no disputed issues of material fact, and the

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court

must view the evidence and the inferences that may be reasonably drawn from the

evidence in the light most favorable to the nonmoving party.  *Weitz Co. v. Lloyd's of*

---

[7]     With respect to Count One, the parties dispute, in part, whether any part of the
Third Amendment constitutes an enforceable requirements contract.  At the motion to
dismiss stage, the Court found that while the Third Amendment removed any defined
quantity that Taylor was required to purchase, the Third Amendment was ambiguous as
to whether the Agreement was an enforceable requirements contract because it still
contained the Preferred Supplier and Consignment Provisions which were arguably
relevant to quantity.  (Doc. No. 25 ("Order") at 7-8.)

Specifically, the Court found that "[b]ecause there are two reasonable
interpretations of the [final amended] Agreement, the ambiguity as to whether the
Amended Agreement was a requirements contract cannot be resolved at the motion to
dismiss stage.  (*Id.* at 8.)

[8]     Taylor concedes that it owes Georgia-Pacific $362,295.89 on its Counterclaim.
(Doc. No. 89 ("Taylor Reply") at 23.)  The Court therefore grants Georgia-Pacific's
motion insofar as it seeks summary judgment on its Counterclaim.

*London*, 574 F.3d 885, 892 (8th Cir. 2009).  However, as the Supreme Court has stated,

"[s]ummary judgment procedure is properly regarded not as a disfavored procedural

shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed

'to secure the just, speedy and inexpensive determination of every action.'"  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

   This Court will consider the cross-motions drawing inferences against each movant as

warranted.  *See, e.g.*, *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir.

1983).  The moving party bears the burden of showing that there is no genuine issue of

material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank v. Magna*

*Bank of Mo.*, 92 F.3d at 743, 747 (8th Cir. 1996).  The nonmoving party must

demonstrate the existence of specific facts in the record that create a genuine issue for

trial.  *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a

properly supported motion for summary judgment "may not rest upon the mere

allegations or denials of his pleading, but . . . must set forth specific facts showing that

there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).

## II.    Count One-Breach of Contract

   To state a claim for breach of contract, a plaintiff must allege:  (1) the existence of

a contract; (2) breach of an obligation imposed by the contract; and (3) damage to the

plaintiff.  *Micro Focus (US), Inc. v. Ins. Servs. Off., Inc.*, 125 F. Supp. 3d 497, 500 (D. Del. 2015).[9]

The proper construction of a contract is a question of law.  *Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists, Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992).  "Under standard rules of contract interpretation, a court must determine the intent of the parties from the language of the contract."  *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014).  "[C]ontractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement."  *NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007) *aff'd*, 945 A.2d 594 (Del. 2008). "When faced with two equally reasonable interpretations of a contract, courts should always construe a contract to be valid."  *Am. Original Corp. v. Legend, Inc.*, 652 F. Supp. 962, 967 (D. Delaware) (citing *In Re Farm Indus., Inc.*, 41 Del.Ch. 379, 196 A2d 582, 589 (1963)).

Because the relevant contract here relates to the sale of goods, it is governed by the Uniform Commercial Code ("UCC").  *See Barlow v. Delhaize Grp.*, Civ. No. 08-565, 2009 WL 1391413, at *7 (D. Del. May 15, 2009).  The Statute of Frauds, codified in Section 2-201 of Delaware's UCC, requires that to be enforceable, a sale of goods must be memorialized by "some writing sufficient to indicate that a contract for sale has been

---

[9]     The parties agree that Delaware law applies to the Third Amended Agreement. (Third Amended Agreement § II(1)(k).)  And in any event, both Minnesota and Delaware have adopted the Uniform Commercial Code.  *See* Minn. Stat. Ch. 336; 6 Del. C. § 2-201.

made between the parties." 6 Del. Code § 2-201.  "[T]he statute's overriding purpose is to indicate that a contract for sale has been made between the parties." *Riegel Fiber Corp. v. Anderson Gin Co.*, 512 F.2d 784, 789 (5th Cir. 1975).  "[T]he Uniform Commercial Code favors the finding of a contract (a binding agreement of the buyer to pay and the seller to deliver) wherever possible." *Falcon Tankers, Inc. v. Litton Sys., Inc.*, 355 A.2d 898, 905 (Del. Super. Ct. 1976).

In the case of an alleged breach by the seller for failure to supply, the UCC provides that "[t]he buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (Section 2-715)."  6 Del. C. § 2-712(2).  The cost of cover represents the increased price of paper buyer purchased "in substitution for those due from the seller."  6 Del. C. § 2-712(1).

"Contracts which measure quantity by referring to the output of the seller or requirements of the buyer are valid in Delaware." *Am. Original Corp. v. Legend, Inc.*, 652 F. Supp. 962, 966 (D. Del. 1986) (citing 6 Del. Code § 2-306).  Moreover, under the UCC, the buyer's requirements are determined by the buyer "in good faith":

> A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith.

6 Del. Code § 2-306 (emphasis added).

While a requirements contract must contain an element of exclusivity, the buyer's obligation to purchase exclusively from the seller may be limited without rendering the buyer's promise illusory.  *See, e.g.*, *Structural Polymer Group Ltd. v. Zoltek Corp.*, 543

F.3d 987, 993 (8th Cir. 2008) (finding that clause in requirements contract giving the buyer the right to purchase from a lower-cost alternate supplier when the contract supplier did not match the price did not render the buyer's obligation illusory because buyer did not have unfettered right to purchase outside the contract); *see also XO Communications, LLC v. Level 3 Communications, Inc*. 948 A.2d 1111, 1120, 1116 n.14 (Del. Ch. 2007) (finding that buyer's obligation to purchase from supplier was an enforceable requirements contract despite contract provision that allowed buyer to purchase from other suppliers in the event that contract supplier in certain circumstances).

### 1.   Supply Obligation

Georgia-Pacific contends that after the removal of the minimum quantity requirement in 2015, there was no defined quantity of goods that Taylor was required to purchase or specific formula for determining a quantity, and therefore, after the Third Amendment, the Agreement served only as a framework for future sales.[10]  Georgia-

---

[10]     Georgia-Pacific claims that it worked to remove Section 2(b), including the minimum supply obligation, so that it would not again face a situation in which it was obligated to supply during a bankruptcy.  Under it's "framework theory" Georgia- Pacific contends that the Agreement's terms took effect if and when Taylor submitted a purchase order for a specific quantity that Georgia-Pacific accepted.

Taylor contends that this explanation is a made-for-litigation theory that does not make sense because Section 2(b) included a provision that specifically permitted Georgia-Pacific the right to cease its supply obligation if it determined that Taylor did not meet its credit standards.  (*See* Agreement § 2(b) ("Supplier shall not be obligated to supply such quantities if Supplier determines that [Taylor] does not meet Supplier's credit standards as determined by Supplier in Supplier's sole discretion.  Taylor maintains that despite removing the minimum volume requirement, both parties intended

Pacific further argues that while the Agreement still contained the Preferred Supplier Provision after the Third Amendment, that provision did not render the Agreement a requirements contract because:  (1) it did not include an express promise that Taylor would obtain all of its requirements from Georgia-Pacific; and (2) the obligation for Taylor to use "commercially reasonable efforts" was too vague to supply a quantity term and did not relinquish Taylor's right to purchase from other suppliers.  To this end, Georgia-Pacific points out that Taylor consistently maintained supply contracts with other roll paper suppliers.  Georgia-Pacific also contends that Section 2(A) of the Agreement, which contains the Preferred Supplier Provision, pertains only to "Products," and operates only to relieve Taylor of any obligation to purchase every product listed on Exhibit A.  Georgia-Pacific also focuses heavily on the last clause in Section 2(a) which states that "the purchase obligations of [Taylor] under this Agreement are nonexclusive," and maintains that no part of Section 2(A), including the Preferred Supplier Provision, converts the Agreement into a requirements contract.

Taylor, however, argues that the Preferred Supplier Provision is sufficiently definite to satisfy the UCC's Statute of Frauds.  Taylor submits that the Preferred Supplier Provision is a requirements contract, and that it demonstrates the parties' intent

_____

that the Agreement remain a requirements contract after the Third Amendment and acted accordingly.

Regardless of Georgia Pacific's motivation to remove section 2(b) of the Agreement, as discussed below, the Court finds that the Agreement, even after the Third Amendment, remained an enforceable requirements contract.

that Taylor purchase, and Georgia-Pacific sell, as much of Taylor's annual paper requirement as Georgia-Pacific is able to supply. Taylor further submits that the statement that "purchase obligations of [Taylor] under the Agreement are nonexclusive," is limited to two specific carveouts, namely, where Georgia-Pacific is unable to "meet[] [Taylor's] quality and delivery requirements" and "limitations imposed by [Taylor's] customers." (Agreement § 2.a.) In support, Taylor points to the language providing that once Taylor has exercised commercially reasonable efforts to purchase from Georgia-Pacific, Georgia-Pacific was required to supply such paper to Taylor. *See* § 2a ("Supplier will supply [Taylor] with the . . . products identified on Exhibit A."). The Court agrees with Taylor.

While the Agreement did not include a promise that Taylor purchase all of its requirements exclusively from Georgia-Pacific, Taylor did not have an unfettered option to purchase from other suppliers. Pursuant to the Preferred Supplier Provision, Taylor was obligated to "exercise commercially reasonable efforts" to purchase from Georgia-Pacific in all but two limited situations. (Preferred Supplier Provision.) Specifically, Taylor was not obligated to purchase from Georgia-Pacific only when Georgia-Pacific was unable to "meet[] [Taylor's] quality and delivery requirements" and where there were "limitations imposed by [Taylor's] customers." (Agreement § 2.a.) The Court finds that this limited non-exclusivity is consistent with an enforceable requirements contract. *Structural Polymer Group Ltd.*, 543 F.3d at 993.

Moreover, the Court finds that Georgia-Pacific's piecemeal interpretation of Section 2(a) is inconsistent with Delaware law because it fails to explain Taylor's

16

obligation to exercise commercially reasonable efforts to purchase from Georgi-Pacific.[11]

Under Delaware law, "contractual interpretation operates under the assumption that the

parties never include superfluous verbiage in their agreement." *NAMA Holdings, LLC*,

948 A.2d at 419.  The Court must therefore "give each provision and term effect, so as

not to render any part of the contract mere surplusage." *Golden Rule Fin. Corp. v.*

*Shareholder Rep. Serv. LLC,* No. 2020-0378-PAF, 2021 WL 305741, at *5 (Del. Ch.

Jan 29, 2021)  Accordingly, the Court declines to construe the statement in the Preferred

Provider Provision that Taylor "will exercise commercially reasonable efforts to purchase

the Products" as mere surplusage.  Based on its plain language of section 2(a) as a whole,

the Court finds that the most reasonable interpretation of the Preferred Provider Provision

is that it obligates Taylor to purchase products from Georgia-Pacific in all but two limited

situations.[12]  As stated above, the Court finds that this is consistent with a requirements

contract.

---

[11]    Georgia-Pacific's interpretation appears to give effect only to last clause in
Section 2(a) while ignoring the preceding clauses that oblige Taylor to use commercially
reasonable efforts to purchase from Georgia Pacific except for two specific carveouts.
(*See* Georgia-Pacific Memo. at 20.)  Similarly, the Court is unpersuaded by Georgia-
Pacific's interpretation that Section 2(a) operates only to relieve Taylor of any obligation
to purchase every product listed on Exhibit A.

[12]    Georgia-Pacific contends that an obligation to use commercially reasonable efforts
does not create a binding requirements contract in part because using commercially
reasonable efforts does not relinquish a buyer's right to purchase from other suppliers and
does not satisfy the UCC's requirement that a contract measure quantity by the
requirements of the buyer.  The Court agrees that in some situations, a blanket statement
that obligates a buyer to use best efforts is insufficient to create a binding requirements
contract.  Here, though, construing Section 2(a) as a whole, the Court finds that the
provision clearly sets forth Taylor's obligation to satisfy all of its requirements through

The Court also finds sufficient extrinsic evidence to support Taylor's interpretation of the Agreement as a requirements contract, even after the Third Amendment.  While Taylor purchased at least 30% of its paper from suppliers other than Georgia-Pacific, the record reflects that Georgia-Pacific was unable to supply all the volume Taylor required.[13]  (Sec. Parker Decl. ¶ 7; Doc. No. 84-6 at 35.)  Because Georgia-Pacific's ability to meet Taylor's volume requirements was one of the limited carveouts under which Taylor could purchase products from other suppliers, the Court finds Taylor's purchases from other suppliers consistent with a requirements contract. The Court simply cannot conclude that the parties intended to convert the Agreement into a mere "framework" by deleting the minimum volume requirement after the Third Amendment.[14]  To the contrary, the Court finds that the parties' prior course of dealing, including the fact that the language in the Preferred Supplier Provision was expressly

Georgia-Pacific in all but two limited situations.  Unlike the cases Georgia-Pacific cites, the Court finds that Taylor's obligation to use commercially reasonable efforts actually did relinquish its right to purchase freely from other suppliers and was sufficiently definite to satisfy the UCC.

[13]    Georgia-Pacific disputes this fact, contending that it produced more than enough roll paper to meet Taylor's requirements, but simply never agreed to sell it all to Taylor. The Court finds that this assertion fails to negate record evidence that Georgia-Pacific could not supply the volume Taylor required.  *See, e.g.*, Doc. No. 84-6 at 35 (admission by Georgia-Pacific's lead salesperson that Georgia-Pacific agreed to pay Taylor a rebate level at a much higher volume than Georgia-Pacific was actually selling because Georgia-Pacific did not have the capacity to manufacture that level of volume).)

[14]    Even if the Court found that each party's interpretation of the Third Amendment was equally reasonable, the Court would still construe it as a valid requirements contract. *Am. Original Corp.*, 652 F. Supp. at 967.  ("When faced with two equally reasonable interpretations of a contract, courts should always construe a contract to be valid.")

maintained in multiple amendments to the Agreement, and that Taylor consistently attempted to purchase as much paper as possible from Georgia-Pacific supports the existence of a requirements contract.

### 2.      Breach

Even if Georgia Pacific had an enforceable supply obligation, Georgia-Pacific argues that Taylor is still not entitled to summary judgment because Taylor has not established as a matter of the law that the Notice Provision applied in the context of Georgia-Pacific's full and total exit from the communication papers business.[15]  Georgia-Pacific also argues that Taylor's insistence that Georgia-Pacific was obligated to manufacture paper at full capacity for six months after it announced the shut-down of a paper mill is nonsensical because no reasonable supplier would ever contract with a buyer to keep an entire operation running solely to benefit a single customer.

Taylor argues that it defies the plain language of the text to read such an enormous exception into Notice Provision and that it is inconceivable that Taylor would have bargained for notice if Georgia-Pacific stopped making one product but accepted no notice at all if it stopped making all of them.  The Court agrees with Taylor and "cannot countenance such an absurd interpretation" of the Agreement.  *Osborn ex rel Osborn v. Kemp*, 991 A.2d 1153, 1161-62 (Del. 2010).

---

[15]     Georgia-Pacific contends that the Notice Provision only applied to discontinuing a basis weight—something distinct from retiring operations.

### 3. Damages

Georgia-Pacific also maintains that it is entitled to summary judgment on Taylor's breach of contract claim because Taylor has not established a legal or factual basis for its contract damages.

### A. Cover Damages

Taylor seeks up to $3,520,000 in cover damages, representing the increased price of paper it allegedly purchased from others after Georgia-Pacific breached the Agreement.[16]   (Doc. No. 66-2, Ex. N at 3.)   Cover damages represent the increased price of products purchased "in substitution for those due from the seller."   6 Del. C. § 2-712(1).   Georgia-Pacific contends that because Taylor has failed to establish a definite quantity due from Georgia-Pacific during the alleged damages period, Taylor lacks a factual foundation from which to calculate what it supposedly purchased in substitution for the paper allegedly owed by Georgia-Pacific.   Georgia-Pacific argues that Taylor's cover damages are improperly calculated based on the increased cost of the paper that Taylor would have bought from Georgia-Pacific, as opposed to an amount actually due from Georgia-Pacific.

As discussed above, the Court finds that even after Third Amendment, the Agreement was an enforceable requirements contract.   At this stage, "[t]he injured party need not establish the amount of damages with precise certainty where the wrong has

---

[16]     Taylor's expert estimated that Taylors' cover damages range from $3,015,000 to $3,520,000 based on different quantities of paper per month.   (Doc. No. 66-2, Ex. N at 3.)

been proven and injury established." *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1131 (Del. 2015) (internal quotation marks and citation omitted).  Here, the Court finds that Taylor has established that it was injured by having to pay more for paper it would have obtained from Georgia-Pacific but for Georgia-Pacific's breach.  Thus, the Court finds that Taylor's cover damages are properly measured by the volume of its unfilled requirements for the six-month period after the breach.  The Court encourages the parties to jointly determine the exact amount of Taylor's cover damages.  If the parties cannot agree, the matter will be reserved for trial.

### B.    Citibank Damages

Taylor also seeks $2,530,000 in lost profits damages, representing five years of profits allegedly lost following the termination of its resale contract with Citibank after Georgia-Pacific's exit from the paper industry.[17]  (*See* Doc. No. 32 at 5; Doc. No. 66-2, Ex. N at 3.)

Georgia-Pacific argues that the Citibank damages are consequential damages and therefore foreclosed by the plain and unambiguous language of the Agreement.[18]  Taylor

---

[17]    Taylor contends that five years is an appropriate timeframe for its lost profit damages because Taylor likely would have renewed its resale arrangement with Citibank for additional terms but for Georgia-Pacific's breach.

[18]    Paragraph 11(c) of the Agreement clearly disclaims "special, indirect, incidental, exemplary, punitive or consequential damages."  (Third Amendment, ¶ 11(c).)  Such limitations of liability for consequential damages are enforceable under the UCC and Delaware law.  *See* 6 Del. C. § 2-719(3) (permitting seller to bar recovery of consequential damages through exclusion clause in the contract).

argues that the Citibank lost profits are direct damages and therefore recoverable despite the terms of the Agreement.

Consequential damages occur when "as a result of [a] breach, the non-breaching party suffers loss of profits on collateral business arrangements." *eCommerce Industries, Inc. v. NWA Intel. Inc.*, No. 7471-VCP, 2013 WL 5621678, at *47 (Del. Ch. Sep. 30, 2013) (quoting *Tractebel Energy Mktg. Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007)). "By contrast, lost profits are not considered consequential damages when profits are precisely what the non-breaching party bargained for, and only an award of damages equal to lost profits will put the non-breaching party in the same position he would have occupied had the contract been performed." *Id.*

Taylor relies on *Biotronik À.G. v. Conor Medsystems Ireland, Ltd.*, to argue that the lost profits from its arrangement from Citibank were direct damages because they were bargained for in the Agreement. 22 N.Y.3d 799 (2014). In *Biotronik,* the Court of Appeals of New York held that lost profits are direct rather than consequential damages when the plaintiff pays the defendant for a product at a price calculated as a percentage of the plaintiff's net sales of the product. *Id.* at 803. The court found it dispositive that the "plaintiff's resale price [was] a benchmark for the transfer price." *Id.* at 808. The court also noted that the contract clearly contemplated that the plaintiff would resell defendant's products, that the profits flowed directly from the pricing formula, and that both defendant and plaintiff depended on the product's resale for their prospective payments. *Id.* at 808-09. The court specifically observed that the lost resale profits were direct because the parties' agreement was "not a simple resale contract where one party

22

buys a product at a set price to sell at whatever the market may bear." *Id.* at 803.  Rather, the price plaintiff paid defendant reflected the actual sales and the sales price of its products.  *Id.*

As in *Bioktronik*, Taylor contends that its lost Citibank profits are direct damages because Taylor bargained for those profits under the Agreement.  To this end, Taylor asserts that Georgia-Pacific knew that the arrangement was a pass-though and shipped the paper purchased by Taylor directly to Citibank.  (Doc. No. 91 ¶ 22.)  Taylor contends that Georgia-Pacific also knew the specific details of the pricing mechanism in the Taylor/Citibank whitepaper SOW, and that the parties agreed to coordinate price changes for the whitepaper in order to maintain a level of profit for Taylor.  (*Id.* ¶ 24.)  Taylor therefore argues that like *Biotronik*, the resale price to Citibank was a "benchmark" for the price at which Georgia-Pacific sold to Taylor.  While the Citibank lost profits are not specifically identified in any version of the Agreement, Taylor argues that the pricing that Georgia-Pacific agreed to was memorialized on a Citibank-specific version of the Agreement's Exhibit A price list.  (*Id.* ¶ 22.)  Because the lost profits flowed directly from the Citibank-specific pricing sheet in the Agreement, Taylor contends that Georgia-Pacific agreed to pay them and therefore the lost profits were a natural and probable consequence of Georgia-Pacific's breach.

Georgia-Pacific argues that *Biotronik* is inapplicable because its Agreement with Taylor was the very type of contract that the *Biotronik* court distinguished as something that the contested contract there was not.  Moreover, Georgia-Pacific argues that even if it knew that Taylor resold certain paper to Citibank, agreed to ship the paper directly to

Citibank at Taylor's request, and maintained a separate price list for the products that

Taylor purchased for resale to Citibank, Taylor's relationship with Citibank was a

collateral business arrangement completely separate from the Agreement.  In support,

Georgia-Pacific argues that (1) whether Citibank decided to order paper from Taylor and

(2) whether Taylor chose to resell Georgia-Pacific paper to Citibank; and if it did (3) how

much to sell and (4) for what price, were all independent decisions made by Taylor and

Citibank unrelated to Taylor's Agreement with Georgia-Pacific.  Therefore, Georgia-

Pacific argues that any profits Taylor may have derived from those third-party sales were

contingent on future deals with a business that was not party to the Agreement and lost

profits resulting from a breach were definitionally consequential damages.

Georgia-Pacific further argues that if Taylor's lost Citibank profits are found to be

direct, they should be capped at six-months.  Georgia-Pacific contends that because its

purported supply obligation ended after six-months-notice, it is axiomatic that Taylor had

no expectation under the Agreement of continued profits from reselling Georgia-Pacific

paper to Citibank once Georgia-Pacific was no longer obligated to supply the product to

Taylor.

It appears to the Court that the parties at least contemplated the resale of Georgia-

Pacific's products to Citigroup.  Based on the record, though, the Court cannot determine

the extent of Georgia Pacific's knowledge, or any role it played with respect to the

pricing of those products.  Therefore, the Court cannot conclude as a matter of law

whether Taylor's lost profits from its arrangement with Citibank were bargained for in

the Agreement.  It is within the province of a jury to weigh the evidence and decide

whether the lost profits were direct or consequential damages.

If a jury determines that the lost profits are direct, the Court agrees with Georgia-

Pacific that the damages are properly capped at six-months.  Under Delaware law,

"recovery for lost profits is limited to those profits which might have been made pursuant

to the performance of the particular contract sued on and during the period for which it

was to run."  *Tanner v. Exxon Corp.*, 1981 WL 191389, at *3 (Del. Sup. Ct. July 23,

1981).  If Taylor's damages were direct, they were bargained for and promised under the

Agreement. Further, if Georgia-Pacific had performed under the Agreement by

complying with the Notice Provision, the Agreement would have terminated after six

months.  Therefore, the Court finds that any right Taylor had to lost profits under the

Agreement also ended at six months.

In short, the Court finds that even after the Third Amendment, the Agreement was

an enforceable requirements contract, Georgia-Pacific breached the Agreement's Notice

Provision, and Taylors' cover damages are properly measured by the volume of its

unfilled requirements during the six-month period after the breach.  Whether Taylor's

lost profits from the termination of its resale arrangement with Citibank are direct or

consequential damages is a question of fact for the jury to determine.  Notwithstanding,

any award of direct damages is capped at six-months.

## III.    Count Two- Promissory Estoppel

Because the Court finds that the Agreement is an enforceable requirements

contract, Count Two is properly dismissed.  *Beck & Panico Builders, Inc. v. Straitman*,

2009 WL 5177160, at *6 (Del. Sup. Ct. Nov. 23, 2009) (citing *Genencor Int'l, Inc. v. Novo Nordisk A/S,* 766 A.2d 8, 12 (Del. 2000) ("Because promissory estoppel substitutes the plaintiff's detrimental reliance for consideration to salvage an otherwise unenforceable promise, it will not apply where the alleged promise was bargained for as part of a contract.")

## CONCLUSION

The Court grants in part and denies in part each party's motion. With respect to Count One, the Court finds that Taylor has established each element of a breach of contract. Specifically, the Court finds that the Agreement, even after the Third Amendment, is an enforceable requirements contract; Georgia-Pacific breached the Agreement's Notice Provision, and Taylor's cover damages are properly measured by the volume of its unfilled requirements for the six-month period after the breach. Whether Taylor's lost profits from the termination of its resale arrangement with Citibank are direct or consequential damages is a question of fact for the jury to determine. Notwithstanding, any award of direct damages is capped at six-months.

Moreover, because the Court finds that the Agreement was an enforceable requirements contract, Count Two of Taylor's Amended Complaint is properly dismissed. Finally, the Court grants Georgia-Pacific's Counterclaim for damages in the amount of $362,295.89 before any award of prejudgment interest, costs, and attorney fees.

**ORDER**

Based on the files, records, and proceedings herein, and for the reasons stated above, **IT IS HEREBY ORDERED** that Taylor's Motion for Partial Summary Judgment (Doc. No. [54]) and Georgia-Pacific's Motion for Summary Judgment (Doc. No. [79]) are **GRANTED IN PART** and **DENIED IN PART** as follows:

1.  Taylor has established each element of Count One but may not recover any lost profit from its arrangement with Citibank:

    a.  The Agreement, even after the Third Amendment, is an enforceable requirements contract;

    b.  Georgia-Pacific breached the Agreement;

    c.  Taylors' cover damages are properly measured by the volume of its unfilled requirements;

    d.  Whether the lost profits from termination of Taylor's resale arrangement with Citibank are consequential damages is a question of fact for the jury; and

    e.  Notwithstanding, any award of direct damages is capped at six-months.

2.  Count Two of Taylor's Amended Complaint is **DISMISSED.**

3.  Georgia-Pacific's Counterclaim for damages in the amount of $362,295.89 before any award of prejudgment interest, costs, and attorney fees is **GRANTED**.

Dated:  December 15, 2021          s/Donovan W. Frank
                                   DONOVAN W. FRANK
                                   United States District Judge